### THE WISCONSIN BANK vs. MORLEY and others.

The grantee of land unconditionally conveyed is not an "assignee," within the meaning of sec. 2, ch. 134, Laws of 1858 (R. S. p. 818), so as to exclude his testimony in his own behalf in an action in which he claims title to such land under such conveyance.

Where an agent empowered to take an assignment to his principal of certain securities and receive a conveyance to the same of land, in exchange for securities held by such principal, takes a conveyance of the land to himself, he has no beneficial interest therein, but is a naked trustee; and one who, being chargeable with notice of the facts, takes a mortgage on such lands, executed by such agent in his own name as security for moneys loaned him for his own use, cannot enforce such mortgage as against the principal, unless the transaction is subsequently ratified by the latter.

Whether mere silence on the part of the principal, when informed of the transaction, would constitute a ratification, is not decided.

The fact of a ratification must be affirmatively shown, by evidence as clear as would be required to show an original authority in the agent to take the conveyance in his own name and execute the mortgage.

APPEAL from the Circuit Court for *Dane* County.

Action to foreclose a mortgage given to the plaintiff by one Aldrich, July 19, 1861, to secure the payment of $500 loaned to him by plaintiff on that day. Aldrich died before the commencement of the suit, having previously conveyed the mortgaged premises to *Morley.* No part of the amount loaned had been paid. *Morley* answered that in June, 1859, one Miller,

who was then president of the bank, plaintiff, and still continued to be so at the commencement of this action, was indebted to defendant $4000, for money loaned; that on the 15th of June, 1860, said indebtedness and interest remaining unpaid, Miller proposed to convey and transfer to defendant, in full discharge of the same, a certain mortgage on lots in Madison, called the Farwell mortgage, certain swamp and school lands, a note against one Sanderson for $500, and also the premises mentioned in the complaint in this action; that defendant accepted this proposition, and (as he himself lived in New York) empowered Aldrich to act as his attorney in completing said transaction by attending to the delivery of a proper discharge to Miller, and the receipt of proper instruments of transfer and conveyance of said property to defendant; that afterwards, on or about the day of the date of the mortgage. in suit, said transaction was attended to and completed by Miller and Aldrich, except as hereinafter stated; that Miller then and there well knew that Aldrich had no interest in said debt, and acted only as defendant's attorney to settle the same according to said agreement; but that he and Aldrich wrongfully, and without defendant's consent, caused the premises mentioned in the complaint to be conveyed to Aldrich absolutely; that immediately thereupon Miller, acting as president and business manager of the bank, plaintiff, but without defendant's knowledge or consent, procured the mortgage in suit to be executed to the bank, to secure a loan of money from it to Aldrich for his private use, which loan was negotiated to Aldrich, and the mortgage taken by Miller as such president; that no part of said loan was ever received by defendant, or applied to his use or benefit, nor has he in any way authorized, ratified or approved of the same; and that he had no notice or information of the execution of such mortgage until long after the premises were conveyed to him by said Aldrich. Defendant therefore asks judgment declaring the mortgage void as against him, and for costs, &c.

On the trial, plaintiff objected to the admission in evidence of the deposition and testimony in open court of defendant *Morley*, " on the ground that said *Morley* was incompetent in his own behalf, as he claimed the mortgaged property under Aldrich, who was deceased, and on the ground that the plaintiff could not be a witness, as Aldrich acted as the agent of defendant *Morley*, and was dead ;" and also objected " that it was incompetent for the said *Morley* to testify as to any matter transacted by Aldrich in his life time." Objection overruled.

The evidence tended generally to sustain the answer. It showed also that in August, 1860, Aldrich became a son-in-law of defendant *Morley ;* that at that time he informed the latter that the matter of Miller's indebtedness had been closed up in accordance with the proposition made by Miller on the 15th of June previous, and accepted by *Morley*, and that the property and securities mentioned in said proposition had been duly conveyed to *Morley*, and the conveyances thereof were in the clerk's office at Madison, for record ; whereupon said defendant delivered to Aldrich the note which was the evidence of Miller's indebtedness to him, and a certificate of bank stock which he held as collateral security, to be surrendered to Miller. Afterwards *Morley* received from Miller a paper writing signed by· said *Morley*, *per* Aldrich as his attorney, in which, after reciting the fact of Miller's indebtedness, the note by which it was evidenced, and the bank stock certificate held as collateral, and that the *Wisconsin Bank* and said Miller had that day made over to him " certain property paying and covering in full the amount of said indebtedness," said *Morley*, by his said attorney, agreed to deliver up to be cancelled said note and certificate, and that the validity of the same was thereby destroyed. Indorsed upon this paper was a subsequent acknowledgment by Miller that he had received the note and certificate therein mentioned. The deed from plaintiff to Aldrich of the premises in question was dated July 17, 1860 ; and that of the same premises from Aldrich to *Morley*,

was dated March 28, 1861, and recorded on the 2d of April following. Said defendant further testified that he never authorized Aldrich to take a conveyance of any part of the property mentioned in Miller's proposition in his own name, and never knew of or suspected his having done so until about September 1st, 1861 ; nor did he know of the existence of the mortgage in suit until that time, when he was informed of it by letter from Miller ; that he had no means of knowing, and never knew, except by information from Aldrich, to whose use the money raised by said mortgage was applied ; but no part of it was ever applied to his (defendant's) use ; that soon after September 1st, 1861, witness wrote to Aldrich (who was in the military service), stating the information he had just received from Miller, and asking an explanation ; that about the 25th of December, 1861, Aldrich informed witness by letter that he had raised said money for purposes of his own, and had applied it to his own use, and that the the reason he had kept witness in ignorance of it was, that he intended to pay it before it matured. Witness further testified that he was not indebted to said Aldrich at any time in any sum whatever. After defendant rested, said Miller, as a witness for the plaintiff, testified: " Mr. Morley introduced Mr. Aldrich to me ; told me he was a fine, reliable young man, who had come west to establish himself here, and wished me to assist him if able. He was in the bank several times, and asked my opinion about Aldrich getting into business here. He recommended him as a man of strict integrity, and reliable in every way. This was in June, 1859. I knew that Aldrich did *Morley's* business here before this mortgage was given. He personally negotiated the settlement of *Morley's* claim. He told me to convey the property covered by this mortgage to him, and he drew the papers on the settlement, and drew the deed for that lot to himself, and presented it ready for execution." Certain letters, exchanged between Mr. Miller and defendant *Morley*, were put in evidence, as follows : From Miller to *Morley*, May

14, 1860, stating that the writer could not pay *Morley* any cash that year, &c., and offering to make over to him "some real estate, and assign some mortgaged property ;" referring particularly to the "Farwell mortgage," and adding: "If you will instruct your agent here what to do, I will do the best by you I possibly can."    2. From same to same, June 15, 1860 : "Yours of the 12th inst. is before me.  *  *  I *cannot* comply with your request; I *cannot* pay the interest.  I have proposed to Mr. Aldrich to put both propositions into one ; I to give you the Farwell mortgage, 52 lots swamp and school lands (640 acres) ; the *brick house in this city* ; note against Sanderson, $500.  *  *  I do not know what Mr. Aldrich will advise.  Should you accept, please let me know without delay.  I make the offer of the above in consideration of a discharge."   The words "the brick house in this city" describe the premises covered by the mortgage in suit.    3. *Morley* to Miller, June 21, 1860 :  "Yours of the 15th inst. is received. *  *  I am expecting to hear from Mr. Aldrich in a day or two, after which I will write him, giving full instructions in relation to this settlement of our matter."   4.   From Miller to *Morley*, June 11, 1862 :   "Will you please advise what is now to be the course taken in regard to Mr. Aldrich's affairs here ?   It seems to me a useless expense to foreclose the mortgages you hold.    [To foreclose the mortgage on the premises you hold ? REP.]    Will you either pay the indebtedness or give me a quit claim and possession ?"   5.   From *Morley* to Miller, June 17, 1862 :   "As soon as I can ascertain the true condition of the late L. D. Aldrich's financial matters, I will give you a definite answer in relation to the mortgage you refer to.   *  *   In Aldrich's last letter to me, he assured me that he had abundant means to pay his indebtedness, and that all would be arranged as soon as he could obtain leave of absence " &c.   6.   From same to same, Aug. 25, 1862 :   "As yet we have not been able to ascertain the condition of the late L. D. Aldrich's finances, or the means he left to pay his in-

debtedness. \* \* \* In case we find nothing available to pay your demands against him, would you be willing to take therefor some portion of the land certificates, or the Farwell note, that you turned out on your indebtedness to me? If so, please inform me what portion thereof would be satisfactory for your entire claim against Aldrich." 7. From Miller to *Morley*, September 1, 1862, acknowledging the previous letter; declining, for certain reasons, to take " for the Aldrich indebtedness " any of the lands covered by the school land certificates or by the Farwell mortgage, as therein proposed; urging that the writer trusted Aldrich solely on *Morley's* recommendation, and that the latter ought to pay the debts thus contracted in Madison; and adding: " Please say by return mail, first, whether you intend to pay his debts; second, whether you intend to keep possession of the brick house until I foreclose." 8. From *Morley* to Miller, September 10, 1862, acknowledging the receipt of the previous letter, and disclaiming any responsibility for Aldrich's debts in Madison. The writer then states that he would feel justified, for certain reasons assigned, in retaining the premises in controversy, and receiving therefor all that the law would allow; and adds: " From his [Aldrich's] bad management of my business there [at Madison], which, by the way, I knew nothing of until he arrived at the seat of war, I am satisfied that he pursued a course of conduct in the transaction of my business altogether contrary to my instructions, as well as to his early moral training, the consequence of which to me will be the loss of hundreds if not thousands of dollars," &c. " However, if you desire immediate possession, and will pay me the $100 you say it will cost to foreclose &c., I will execute to you my Q. C. D., and [give you] possession." 9 and 10. From Miller to *Morley*, September 13th, and 22d, 1862. These have no importance. Of these letters the second and third were put in evidence by the defendant *Morley;* the others by the plaintiff.

The court found the facts substantially as alleged in the an-

swer, and rendered judgment according to the prayer thereof; from which the plaintiff appealed.

*Hopkins & Foote*, for appellant:

1. *Morley* was the "assignee" of Aldrich within the meaning of sec. 2, ch. 134, Laws of 1858 (R. S., p. 818), and was therefore incompetent to testify, Aldrich being dead. Both parties claim under and through Aldrich. "Assignee" is the most comprehensive term the legislature could use. It, or "assigns," is the word generally used in statutes to denote the purchaser of or successor to the title to property of all kinds that can be assigned or disposed of by a party or by operation of law. The object of the law is, to prevent one party to a contract from testifying when the other party to it is dead, if either claims under or through the other party to the contract. It does not permit a purchaser to enlarge his interest, or to impair the interest of others, in the subject of the assignment, whether real or personal property, by his own testimony. This case strongly illustrates the reason of the rule. If Aldrich were alive, he might show that *Morley* authorized him to take the deed in his own name; but as he is dead, we have only the testimony of one of the parties to the transaction, and that one a party in interest. 2. Counsel argued that the testimony, taken together, shows that *Morley* had given Aldrich power to deal with the property as he pleased, and that Miller, from defendant's introduction and recommendation of Aldrich, had a right to believe that the latter was acting within the scope of his authority. If defendant had no knowledge before September, 1861, of the fact that Aldrich had taken a deed of the premises in dispute to himself and given a mortgage thereon, and if it was a fraud upon him, would he not have *then* answered Miller's letter informing him of the facts, and repudiated the transaction? But he waited until September, 1862, after Aldrich's death, and a year after he knew of the mortgage, when he first intimated to Miller that the mortgage was not right.—Counsel also commented on *Morley's* letters of 17th

June and 25th August, 1862, as showing that he had not then thought of treating the transaction as fraudulent and void. 3. Defendant, by not repudiating the unauthorized acts of his agent at the first moment after he was notified of them, ratified them. *Delafield v. State of Illinois,* 26 Wend., 227 ; *Bredin v. Dubarry,* 14 S. & R., 27, 30 ; *Lee's Adm'r v. Fontaine,* 10 Ala., 756, 771 ; *Lawrence v. Taylor,* 5 Hill, 108, 113 ; ·Story on Agency, §§ 255–58. Intimacy between the parties is an important circumstance bearing on the question of ratification. 2 Johns. Cases, 423, 430 ; *Cairnes v. Bleecker,* 12 Johns., 300 ; *Benedict v. Smith,* 10 Paige, 126, 130 ; 1 Parsons on Con., 46 ; 16 Pa. St., 289 ; 3 Cow., 281 ; 4 Mason, 296.

*Gregory & Pinney,* for respondent, to the point that a mortgagee or grantee is not an *assignee* within the meaning of sec. 51, ch. 137, R. S., or of sec. 2, ch. 134, Laws of 1858, cited *Penny v. Black,* 6 Bosworth, 50, and cases there cited. 2. The case presented is that of a special agent attending to an exchange of securities on behalf of his principal, and mortgaging it, for his own private purposes, to a party chargeable with notice of his wrongful act at the time of taking the mortgage. In making the mortgage he did not assume to do any act in the name of his principal; and the doctrine of ratification by the principal extends only to unauthorized acts done *in his name* by the agent. It was not within the scope of any agency which the evidence· tends to establish, either special or general, for Aldrich to use the property of his principal for his own use, or to pledge or mortgage it to raise funds for a private enterprise of his own. *Young v. White,* 7 Beavan, 506; 1 Wash. C. C., 454. Counsel further cited Story on Agency, §§ 225, 229, 437, and Dunlap's Paley, 218, note a.—The evidence to show a ratification should be as strong as would be required to show consent in the first instance. Mere silence on *Morley's* part would not amount to a ratification, unless it appears " that the consequences of his forbearing to give notice had been an alteration in the situation of the bank for the worse, or even

of his own for the better." Lord TENTERDEN, cited in Dunlap's Paley, 232; *Robertson v. Kensington*, Lloyd & W.'s .Merc. Cases, 187.—In order to hold the mortgage good there must be facts shown sufficient to constitute an estoppel.

*By the Court*, DIXON, C. J.   I do not think that the grantee of lands, unconditionally conveyed as in this case, is an " as-. signee," within the statute prohibiting the examination of a party to an action as a witness in his own behalf, where such party claims as assignee and the original assignor is dead.   R. S., p. 818, ch. 134, sec. 2, Laws of 1858.   It seems to me that the word " assignee " is employed in its more usual and appropriate sense, of one suing or defending to enforce rights or avoid demands devolving upon him in a representative capacity; of one standing in the place of the original assignor, to assert rights which had accrued to, or defeat claims which had arisen against such assignor before the assignment, by virtue of which the same rights passed to, and the same claims accrued against, the alleged assignee.   I think the term " assignee " means a person who claims under the " assignor," and in subordination to his rights and duties, and that it cannot be applied to one who, as the unqualified owner of property, sues or defends strictly in his own right.   Such is the defendant *Morley*.   He defends as the owner of the estate supposed to have been mortgaged to the bank, and not as the representative of Aldrich or in subordination to his rights.   In fact Aldrich had no rights—no beneficial interest whatever which he could transfer to the bank; it being already known to the bank, or to Miller, that the property belonged and ought to have been conveyed to *Morley*, and that Aldrich was at most a mere naked trustee or title holder for him.   If, before Aldrich conveyed to him, *Morley* had instituted an action, as he might, against Aldrich for a conveyance, and against the bank to remove this incumbrance, could it have been said that in such proceeding he was acting as Aldrich's assignee ?   Certainly not.   He would

have claimed adversely to both Aldrich and the bank, and his right would have been prior and superior to that of either. By the conveyance from Aldrich to him, *Morley's* claim against Aldrich for the legal title is disposed of, but his claim against the bank to have the incumbrance removed remains unchanged. The defense in this action is but another form of asserting the same claim, and in making it, *Morley* as clearly and truly stands upon his own prior and paramount right, as he would have done had he instituted an action in the manner above indicated. In no just sense can he be said to defend as the assignee of Aldrich.

But the construction contended for by the counsel for the bank involves this further consideration. The disqualification of the party depends wholly upon the character in which he sues or defends, and not at all upon the facts of the controversy, or the nature of the facts to which he may be called to testify. If he sues or defends as "assignee," he cannot be admitted to give evidence under any circumstances. He cannot be examined to rebut the testimony of the opposite party upon transactions between themselves, nor to prove or disprove any alleged fact, though it may have been unknown to the original assignor, and one of which, if alive and called, he could say nothing. Every grantee of lands suing for or defending his title or possession, would be excluded whenever the original grantor is dead (for the statute is, "the original assignor"), and that though such grantor died years before the matters in controversy actually arose. I am satisfied that such was not the intention of the legislature, and that it would be doing violence to their language so to construe it. I understand the courts of New York to have given the same construction to a like statute of that state. *Penny v. Black*, 6 Bosw., 50; *Crosby v. Nichols*, 3 Bosw., 450; *McGinn v. Worden*, 3 E. D. Smith, 355.

The admissibility of *Morley's* testimony being established, the merits of the controversy seem less difficult. There can be

no pretense that Aldrich had original authority from *Morley* to execute the mortgage. Indeed this is scarcely claimed by the bank. The conversation of *Morley* and his recommendations to Miller at the time he introduced Aldrich in the summer of 1859, amount to nothing by way of establishing such authority. They were mere general words of commendation, employed on occasion of the introduction of a stranger, and not intended nor understood as the grant of authority. Miller, who represents the bank throughout the transaction, took the mortgage knowing that Aldrich was not the owner and that the property was *Morley's*. He took it without the slightest evidence that Aldrich was authorized by *Morley* to execute it. It turns out upon trial that Aldrich had no such authority. So far then the mortgage was void as against *Morley*, and the only ground upon which it can be sustained is that taken by counsel, namely, that *Morley* subsequently acquiesced in and ratified it. Upon this point it is urged that Miller, in September, 1861, notified *Morley* that he had made the loan and taken the mortgage, and that *Morley* waited until September, 1862, before repudiating it, or informing Miller that Aldrich acted without authority. If it be admitted that the case is one where mere silence on the part of *Morley*, after notice from Miller, would constitute a ratification, still I do not think there is any proof to warrant the application of the doctrine. *Morley*, who admits the receipt of Miller's letter in September, 1861, testifies to nothing of the kind. True, he says he wrote to Aldrich for information respecting it, but he does not say that he did not reply to Miller. Neither does Miller, himself a witness, testify that *Morley* neglected to answer, or that *Morley* first informed him of Aldrich's want of authority in September, 1862. Counsel seem to assume the fact because in the series of letters which passed between *Morley* and Miller, and which were introduced on the part of the bank, the first in which *Morley* denies the validity of the mortgage was dated in September, 1862. But it is obvious that the letters introduced

were not all which passed between the parties. Of those introduced, the first from *Morley* by no means indicate that he had been slow in repudiating the mortgage. On the other hand it is fairly to be inferred from them, not only that he had replied to Miller's first communication, but that he had informed him that the mortgage was invalid. He speaks of the claim as one which must be collected from Aldrich's estate. And his letter of September, 1862, was written in answer to one from Miller of the first of the same month. Again, Miller's letters tend to the same conclusion. In that of June 11th, 1862, he writes for advice as to what is *then* to be the course taken in regard to Aldrich's affairs in Madison. This by no means indicates that *Morley* had kept silence, or that he had acquiesced in or acknowledged the validity of the mortgage. But aside from this criticism upon the correspondence, I hold that the fact of ratification, if ratification there was, should be as clearly made out in evidence as that of original authority, in case the bank had relied upon that. In either case the burden of proof is upon the bank. If *Morley* did not reply to Miller for the space of a year, or if, replying, he did not deny Aldrich's authority or admitted it, the fact was one susceptible of clear and easy proof, and should have been placed in clear light before the court. Miller was upon the stand. He could have testified to it or produced the letters. *Morley* was upon the stand, and he also might have been questioned. But instead of this, no question of the kind was put to either, and I think there is no evidence in the case authorizing the assumption of the counsel, and that the judgment should be affirmed.

Judgment affirmed.